# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

DENISE VENATOR, as surviving )
spouse of RICKY LEE VENATOR, )
and as the Administratrix of the )
Estate of RICKY LEE VENATOR, )
)
    Plaintiff, )
) Case No. CV415-086
v. )
)
INTERSTATE RESOURCES, INC., )
INTERSTATE PAPER, LLC, )
and MICHAEL JOSEPH WINGATE, )
)
    Defendants. )

# **ORDER**

In this wrongful death action, plaintiff Denise Venator moves to compel from defendant Interstate Paper, LLC, the production of (1) a "supervisor's report" created by Interstate Paper, and (2) emails between Interstate Paper employees and an Occupational Safety and Health Administration (OSHA) investigator. Doc. 33. Should the Court grant her motion, Plaintiff also seeks leave to re-depose three Interstate Paper employees who testified about the report and emails. Doc. 33-1 at 24. Interstate Paper opposes, contending that the "self-critical analysis"

("SCA") privilege, and the inadmissibility of subsequent remedial measures, bar discovery of the report and emails. *See* doc. 38 at 17-23.

I. **BACKGROUND**

On November 27, 2013, Ricky Venator, a truck driver employed by a non-party, arrived at Interstate Paper's warehouse in Riceboro, Georgia. *See* doc. 33-1 at 1; doc. 9-1 at 7. He subsequently asked defendant and Interstate Paper employee Michael Wingate for assistance in removing a defective mud flap from his truck. Doc. 33-2 at 2. Wingate obliged, using a fork lift to aid removal. Doc. 33-1 at 1. The parties hotly dispute what precisely happened next, but one thing is clear -- Venator died after being pinned between the fork lift and his truck's trailer.

Plaintiff Denise Venator (Ricky's wife on her own behalf and as representative of his estate) sued originally in state court, asserting state law causes of action; defendants later removed. Doc. 1. In discovery, plaintiff requested that defendants produce, among other things: (1) "All incident reports or accident reports that were made as a result of the incident in which Ricky Lee Venator was fatally injured on defendants' premises;" (2) "Copies of any notification, report of injury or correspondence that was sent to OSHA by INTERSTATE PAPER, LLC,

2

relating to the incident when Ricky Lee Venator was fatally injured on November 27, 2013;" (3) "Copies of any and all correspondence, citations, violations, and other documents received by INTERSTATE PAPER, LLC, from OSHA relating to the incident when Ricky Lee Venator was fatally injured. . . .;" and (4) "A copy of any written report prepared by any adjuster, appraiser, employee, agent or representative of Defendant or its insurer as a result of Plaintiff's alleged occurrence." Doc. 33-2 at 16-22 (document request nos. 21, 28, 29, and 34). Defendants objected to each of those requests on grounds they sought "subsequent remedial measures, [and] self-critical analysis." Doc. 33-2 at 16-22.

Defendants nevertheless produced many documents,[1] but they withheld a "Supervisor's Report of Injury/Illness" and five pages of emails between Interstate Paper employees and OSHA. Doc. 33-1 at 7. For both the report and emails, defendants' privilege log characterizes the documents as subsequent remedial measures and claims the SCA

---

[1] More precisely, Interstate Paper produced documents. Interstate Resources claims to have no responsive documents -- indeed, it says there's no basis for its inclusion in this case -- because it "never employed Wingate, it did not train or supervise Wingate, it does not own the premises where the accident occurred, and it did not have custody or control of the subject forklift at any time." Doc. 38 at 3. That may well be the case, but for purposes of this Order, it's irrelevant whether Interstate Resources is a proper party. That is a matter for another motion and the Court will not address it here. For present purposes, it's enough to say that whichever defendant controls the documents at issue must comply with this Order.

3

privilege justifies their withholding. The parties attempted to resolve their dispute over the report and emails, but ultimately those efforts failed. Plaintiff then filed the present motion to compel production of the documents. Doc. 33.

## II. ANALYSIS

### A. SCA Privilege

Defendants first contend that compelled production of the supervisor's report "will force Interstate Paper to make the Hobson's choice of aggressively investigating accidents, correcting any dangerous conditions, and possibly creating a self-incriminating record as opposed to deliberately avoiding making a record on the subject, which may lessen the risk of civil liability." Doc. 38 at 17 (quotes omitted). To prevent that dilemma and to incentivize accident investigations, defendants urge the Court to apply the SCA and block production of the report. *Id.* Regardless of the policy rationales underlying the SCA, says plaintiff, the Court must apply Georgia's privilege law which, plaintiff contends, lacks an SCA privilege. Doc. 33-1 at 14-19.

The parties' arguments amount to a duel between two cases and two different analytical approaches to deciding whether the SCA

privilege exists. Plaintiff champions *Lara v. Tri-State Drilling, Inc.*, 504 F. Supp. 2d 1323 (N.D. Ga. 2007), which looked first to Fed. R. Evid. 501[2] to ascertain "whether to recognize and apply the [SCA]." *Lara*, 504 F. Supp. 2d at 1327. That court saw only Georgia tort claims before it, so it examined Georgia law for an SCA privilege. *Id.* It never found one in case or statutory law. *Id.* "[A]bsent a recognition of the [SCA] privilege by Georgia state courts or the state legislature," *Lara* refused "to make . . . a leap of state law interpretation" and apply the SCA. *Id.* at 1328.

Arguing that "*Lara* is a Northern District case [that] has no precedential value for this Court,"[3] doc. 38 at 18, defendants ground their argument in the analytical avenue trod by *Joiner v. Hercules, Inc.*, 169 F.R.D. 695 (S.D. Ga. 1996). Likewise faced only with state law claims, *Joiner* made the leap *Lara* refused; it recognized the SCA

---

[2] Rule 501 mandates that state law determine privilege applicability when state law "supplies the rule of decision" for "an element of a claim or defense."

[3] "Precedential value" arguments are quasi-red herrings when, as here, the only authorities in play are district court decisions. No district court order truly has binding precedential value, whether in-district or out. They may only persuade. *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) (district judge's are not bound by their own decisions, though "a judge ought to give great weight to his own prior decisions[, and a] circuit court's decision binds the district courts sitting within its jurisdiction while a decision by the Supreme Court binds all circuits and district courts.").

5

privilege despite the Georgia legislature's and courts' silence on the matter. *Id.* at 698-99. In doing so, it reasoned that "[t]he policy supporting the SCA privilege[4] mirrors [Georgia's] statutory medical 'peer review' privilege."[5] *Id.* at 699. "Given that at least two other federal courts in Georgia ha[d] recognized" the privilege, and that it "promote[d] sufficiently important interests to outweigh the need for probative evidence," *Joiner* applied it and barred production of protected documents. *Id.*[6]

---

[4] *Joiner* characterized the policy rationale as encouraging private companies to self-audit, "in order to fully comply with" laws and regulations, "without fear that those audits will be discoverable." 169 F.R.D. at 699.

[5] Under O.C.G.A. § 31-7-143:

> [t]he proceedings and records of medical review committees shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by such committee; and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions, or other actions of such committee or any members thereof.

*See also* O.C.G.A. § 31-7-133 (protecting "the proceedings and records of" medical peer review organizations from "discovery or introduction into evidence in any civil action").

[6] *Shipes v. BIC Corp.*, 154 F.R.D. 301 (M.D. Ga. 1994) followed the same path. It too acknowledged the silence of Georgia law, but nevertheless found that, given O.C.G.A. § 31-7-143 and the similar policy rationales underlying it and the SCA, "Georgia courts would endorse the [SCA]." *Shipes*, 154 F.R.D. at 306-07.

6

*Lara*, not *Joiner*, persuades because it rests on the bedrock of Fed. R. Evid. 501, which indubitably applies in cases like this, where state law provides the rules of decision. Consequently, state privilege law decides whether the SCA privilege exists here. *See* Fed. R. Evid. 501. Put differently, the wisdom of particular policy rationales or what federal courts (whether from this district or others) have said about the matter, *see Joiner*, 169 F.R.D. at 699, must cede the stage to Georgia law. *Id.*; *Lara*, 504 F. Supp. 2d at 1327; *cf. Adeduntan v. Hosp. Auth. Of Clarke Cnty.*, 2005 WL 2074248 at * 10-11 (M.D. Ga. Aug. 25, 2005) (proceeding under the permissive portion of Rule 501 that allows federal courts to recognize new privileges, court discussed Georgia's statutory medical peer-review privilege, but refused to apply it because it "would essentially prevent [the] plaintiff from rebutting a federal immunity defense [and] would defeat a federal [civil rights] claim which bears little relation to the type of claim the privilege was designed to address"). And Georgia state courts and the state legislature have never recognized the SCA privilege,[7] or any peer-review-esque privilege, outside the medical review context.

---

[7] As *Lara* astutely noted, Georgia's legislature amended O.C.G.A. § 31-7-133 in 1984

*Joiner*, then, despite being a Southern District decision, lacks persuasive value. Instead,

> [t]he narrow approach taken by the Georgia legislature, and the complete absence of the Georgia courts having recognized a self-critical analysis privilege, leads this court to conclude that Georgia law does not allow for such a privilege. In a case such as this, where state law provides the rule of decision, a privilege exists only when created by state law. The fact that the legislature might create the privilege in the future, or that the state courts might recognize such a privilege, does not give this court the authority to apply the privilege in this case.

*Lara*, 504 F. Supp. 2d at 1328. Because Georgia does not presently recognize an SCA privilege, it cannot offer Interstate Paper's supervisor's report and OSHA emails disclosure protection.

### B. Subsequent Remedial Measures

Defendants also contend that Fed. R. Evid. 407[8] bars discovery of the report and emails because they are subsequent remedial measures. *See* doc. 38 at 22-23. Not so, says plaintiff. The report and emails merely

---

by "narrowing the definition of 'review organization' to include only those working in the healthcare industry." 504 F. Supp. 2d at 1328 (citing *Emory Clinic v. Houston*, 258 Ga. 434, 435 (1988). Since then, and despite cases like *Joiner* and *Shipes*, §§ 31-7-133 and -134 have remained limited to the healthcare context, and no Georgia court has recognized the SCA privilege.

[8] "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; [or] culpable conduct. . . But the court may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures." Fed. R. Evid. 407.

document "how an incident happened or what caused it to happen, discuss[] an incident, or contain[] an admission that a defendant was at fault." Doc. 33-1 at 21. Because they "are not actions that prevent a future injury," plaintiff argues they "do not constitute a remedial measure" barred by Rule 407.

Whether or not the disputed documents reflect remedial measures, the Court must first address the important, yet oft-elided, distinction between admissibility and discoverability. "[T]he purpose of discovery is to provide a mechanism for making relevant information available to the litigants." *Lozano v. Md. Cas. Co.*, 850 F.2d 1470, 1473 (11th Cir. 1988) (emphasis added). To that end, its scope is broad. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . ."). Indeed, so long as it "has any tendency to make the existence of any fact or consequence more or less probable," *United States v. Capers*, 708 F.3d 1286, 1308 (11th Cir. 2013), "information *need not be admissible* at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1) (emphasis added); *see also Daniel Defense, Inc. v. Remington Arms Co.*, 2015 WL

6142883 at * 2 (S.D. Ga. Oct. 19, 2015) ("Rule 26 . . . sets forth a very low threshold for relevancy, and thus, the court is inclined to err in favor of discovery rather than against it.").

Rule 407, because it "governs the admissibility of evidence," not "pretrial discovery," *Laws v. Stevens Transp., Inc.*, 2013 WL 941435 at * 3 (S.D. Ohio Mar. 8, 2013), affects discoverability only insofar as it helps discern whether a document is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); *see also Cohalan v. Genie Indus., Inc.*, 276 F.R.D. 161, 166 (S.D.N.Y. 2011) (although Rule 407 helps delineate "what is admissible[, it] does not define what is discoverable"); *Bernat v. Cal. City*, 2010 WL 4008361 at * 5 (E.D. Cal. Oct 12, 2010) ("[T]hough the evidence discovered may not, ultimately, be admitted at trial, this is no basis for refusing to disclose it during discovery."); *Lesemann v. Gen. Nutrition Companies, Inc.*, 2003 WL 22872035 at * 1 (E.D. Pa. Oct. 9, 2003) (if information "is reasonably calculated to lead to the discovery of admissible evidence," then Rule 407 cannot bar its discovery even if it could bar its admissibility at trial).

At this stage, the Court cannot predict how plaintiff will use at trial documents she obtained in discovery. *See Laws*, 2013 WL 941435 at * 3

("It is certainly possible that plaintiffs will wish to use [the discovery materials to impeach] -- but they will not know that until they take discovery on the issue."). Whether or not they are ultimately admitted, though, so long as the supervisor's report and emails appear reasonably calculated to lead to admissible evidence, they are relevant and must be produced.

Upon *in camera* inspection, the report contains factual details of the incident that caused Venator's death, a brief discussion of necessary preventative actions, and steps Interstate Paper took post-incident to mitigate the risk of it recurring. Whether characterized as remedial measures or not (that's a matter for a motion *in limine* or an evidentiary ruling at trial), the report is unquestionably relevant if for no other reason than it provides a detailed factual summary of what happened, right down to the safety gear Wingate wore. Even those portions that smell strongly of remediation, like the post-incident risk-mitigation measures, could potentially be admissible if used to impeach (defendants do not contest ownership or control of the Riceboro, Georgia warehouse or the forklift that crushed Venator). Hence, they are relevant and discoverable.

The emails are, too. They comprise an OSHA employee's inquiries about Wingate's pre-incident training on the forklift that killed Venator and Interstate Paper's responses detailing why it believed its actions complied with various work safety regulations. That an OSHA investigator wanted Interstate Paper's training records in order to determine whether it properly trained Wingate relates directly to plaintiff's negligent training claim, among others, as well as defendants' contributory negligence defense (doc. 6 at 2) and potential liability. And as with the report, any portion of the emails that constitute remedial measures still might be used for purposes other than proving culpability, so they remain discoverable despite Rule 407.

*Prescott v. CSX Transport, Inc.*, 2013 WL 1192820 (S.D. Ga. Mar. 22, 2013), relied on by the defendants to show that reports like the supervisor's report are subject to Rule 407, is not to the contrary. There, in the context of a motion *in limine*, this Court found a report "not admissible for impermissible purposes under Rule 407" because it had been "prepared for the purpose of improving procedures to prevent future harms" and was thus "plainly evidence regarding subsequent remedial measures." *Id.* at * 2. *Prescott* never dealt with questions of

discoverability, and any persuasive weight it carries therefore is limited to what kinds of reports constitute subsequent remedial measures and their admissibility at trial. Whether the supervisor's report is a subsequent remedial measure or not (and thus whether Rule 407 bars its admission to prove culpability), it might be used to impeach and so remains discoverable.

## III. CONCLUSION

Neither the SCA privilege nor Rule 407 protect Interstate Paper's supervisor's report or the OSHA emails from disclosure. Plaintiff's motion to compel (doc. 33) therefore is **GRANTED**. Defendants have seven days from the date this Order is served to produce the documents (reviewed by the Court *in camera*) to plaintiff. Thereafter, plaintiff may re-depose the three Interstate Paper employees -- Mike McGowan, Ronnie Moore, and Michael Hardy -- whom defense counsel instructed not to respond when questioned about the contents of the report and emails.[9]

---

[9] Defense counsel, in correspondence with plaintiff's attorney, has already consented to these re-depositions should the Court rule in plaintiff's favor on this motion. *See* doc. 33-3 at 6 (defense counsel consenting to re-deposing "any deponent regarding the privileged documents in the event . . . the Court rules against us on [plaintiff's] Motion to Compel").

**SO ORDERED**, this 29Th day of October, 2015.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA