# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

DENISE VENATOR, as surviving )
spouse of RICKY LEE VENATOR, )
and as the Administratrix of the )
Estate of RICKY LEE VENATOR, )
　　　　　　　　　　　　　　　　)
　　　　Plaintiff, )
　　　　　　　　　　　　　　　　)　　　Case No. CV415-086
v. )
　　　　　　　　　　　　　　　　)
INTERSTATE RESOURCES, INC., )
INTERSTATE PAPER, LLC, )
and MICHAEL JOSEPH WINGATE, )
　　　　　　　　　　　　　　　　)
　　　　Defendants. )

# ORDER

In this wrongful death action, plaintiff Denise Venator sues defendants Interstate Resources, Inc., Interstate Paper, LLC (Interstate), and Michael Joseph Wingate for the wrongful death of her husband, who perished in an industrial accident due to their alleged negligence. Doc. 1.[1] She moves to compel from Interstate supervisor evaluations of

---

[1] Plaintiff asserts negligence and negligence *per se* claims against all defendants, and negligent hiring and retention, training, and supervision claims, premises liability, and punitive damages claims against the Interstate defendants. *See* doc. 9-1.

Ronnie Swindell, defendant Wingate's supervisor, who generated a report about the accident.[2] Doc. 59.

She also moves to strike defendants' answer, enter default judgment in her favor, levy attorney's fees and costs as sanctions, and reopen discovery to conduct a forensic evaluation of defendants' IT system -- all because of alleged nefarious discovery conduct surrounding defendants' document production. Doc. 61. Defendants oppose both motions, arguing that (1) plaintiff failed to negotiate in good faith before moving to compel (doc. 112 at 3); (2) Swindell's evaluation is confidential and irrelevant (*id.* at 8-12); and (3) no sanctions are appropriate because defendants supplemented their inadvertent non-disclosures as contemplated by the Fed. R. Civ. P. 26.

## I.   BACKGROUND

As the Court previously found:

On November 27, 2013, Ricky Venator, a truck driver employed by a non-party, arrived at Interstate Paper's warehouse in Riceboro, Georgia. *See* doc. 33-1 at 1; doc. 9-1 at 7. He subsequently asked defendant and Interstate Paper employee Michael Wingate for assistance in removing a defective mud flap from his truck. Doc. 33-

---

[2]   Swindell, an Interstate Paper employee, supervised defendant Michael Wingate before and at the time the accident underlying this action occurred. *See* doc. 112 at 2. As discussed below and in a previous Order (doc. 53), he also filled out a "Supervisor's Report of Injury/Illness" that documented the accident.

> 2 at 2. Wingate obliged, using a fork lift to aid removal. Doc. 33-1 at 1. The parties hotly dispute what precisely happened next, but one thing is clear -- Venator died after being pinned between the fork lift and his truck's trailer.

*Venator v. Interstate Resources, Inc.*, 2015 WL 6555438 at * 1 (S.D. Ga. Oct. 29, 2015).

After defendants removed this case from state court, discovery eventually commenced but quickly grew contentious. Plaintiff moved to compel production of a "Supervisor's Report of Injury/Illness" authored by Swindell, and *all* emails between other Interstate employees and the Occupational Health and Safety Administration (OSHA). Doc. 33. Defendants opposed but tendered what they claimed was the sole report and all OSHA-related emails to the Court for an *in camera* inspection. After reviewing the documents, the Court compelled their production and allowed plaintiff to re-depose Jimmie McGowan (Interstate Paper's former HR head), Ronnie Moore (first aid and safety coordinator at Interstate Paper), and Michael Hardy (Swindell's supervisor) concerning the report and emails. Doc. 53.

Defendants complied with that Order and produced the *in camera*-inspected documents to plaintiff on November 5, 2015. Doc. 59-3. The

parties then scheduled the three depositions for December 17, 2015. Doc. 59-8.

Fourteen days before those depositions, McGowan turned over to the defense 55 pages of additional emails that he allegedly located on his work computer "as part of [his] retirement clean out." Doc. 117-6 at 3. Counsel reviewed the documents and discovered that they contained unproduced, responsive emails between Interstate Paper employees and OSHA regarding Wingate's forklift training. Doc. 117-2 at 1. Defendants produced the emails to plaintiff the next day, during a deposition. *Id.*; doc. 61-1 at 15.

The production surprises continued on December 16, 2015 -- the day before Hardy's deposition -- when defendants turned over a new copy of the supervisor's report. Doc. 117-1 at 2. Although largely the same, the versions produced on November 5, 2015 (Report One) and December 16, 2015 (Report Two) differ in key respects. Report One (doc. 117-1) was written by Hardy,[3] but signed by Swindell (not Hardy), and dated

_____

[3] The Court and plaintiff only learned of Hardy's authorship well after Report One was reviewed *in camera* and produced to plaintiff. Based on defendants' representations at the time (*see, e.g.,* doc. 99 at 110 (Swindell testifying during his first deposition that he prepared the supervisor's report on November 27, 2013)), both the Court and plaintiff thought that Swindell drafted and signed the report.

November 27, 2013.[4]  Doc. 103 at 51.  By contrast, Report Two is undated and was written entirely by Swindell (he also signed it).  Doc. 117-1 at 4. Importantly, Hardy drafted Report One *after* Swindell penned Report Two, ostensibly because of Swindell's poor penmanship.[5]  *See* doc. 103 at 10 (Q:  "[W]hy did you rewrite [Report Two]?  A.  The main purpose was legibility.").

It would not be unreasonable for one to conclude that the Report discrepancies stem from a desire to "shape" the facts of the accident and its aftermath.  Report One states that "use of the clamp truck to remove a mud flap" was an "action[] by [Wingate that] may have contributed" to Venator's death (doc. 117-3 at 8), while Report Two reads "*improper* use of clamp truck to pull mud flap off."  Doc. 117-1 at 3 (emphasis added). Under Report One's "unsafe acts" column, which contains 13 options to check (and instructs the report's author to check only one), Hardy checked "other" and listed "unintended use of clamp truck."  Doc. 117-3

---

[4]  Report One was not written or signed on November 27, 2013, the day Ricky Venator died.  Hardy testified, after defendants finally produced Report Two, that he drafted Report One the week following Venator's fatal accident.  Doc. 103 at 7.

[5]  The Court had no trouble deciphering Swindell's handwriting which, though not that of an elementary school penmanship teacher, came nowhere close to illegible. *Cf. Hurt v. Zimmerman*, CV415-260, doc. 1 (S.D. Ga. Sept. 25, 2015) (*pro se* handwritten, largely illegible, complaint).

at 10.  Swindell, in Report Two, listed "operating equipment *improperly*" under "other," and also checked the "taking an unsafe position or posture" box despite the one-box-only instruction.  Doc. 117-1.  Finally, under the "additional comments" section, the last sentence of Report One claims that "[a] safety meeting topic on safe and proper use of PIT equipment is planned," doc. 117-3 at 11, while Report Two omits that sentence.  Doc. 117-1 at 6.[6]

Armed with Report Two (authored and signed by Swindell), plaintiff re-deposed Hardy (the drafter, but not signer, of Report One). Questioning about the various discrepancies between Report One and Two eventually led plaintiff's counsel to ask whether Hardy "g[a]ve Mr. Swindell . . . yearly evaluations."  Doc. 103 at 23.  He said "yes," but further questioning about evaluations resulted in Hardy stonewalling.[7] *See, e.g., id.*

That exchange precipitated a December 21, 2015 document request for copies "of any and all evaluations of Ronnie Swindell from November

---

[6]  Reports One and Two contain other, minor and irrelevant differences.

[7]  When asked whether he "generally g[a]ve [Swindell] good evaluations," Hardy stated that he didn't "think that's pertinent."  Doc. 103 at 23.  Asked if he gave Swindell good evaluations, Hardy refused "to comment on that" because it was "private information that's private to the employee and company." *Id.* at 23-24.

27, 2012, until the present." Doc. 112-1 at 3. Defendants objected on a variety of grounds, revealed they were withholding one responsive document, but expressed willingness "to produce th[e] document pursuant to a confidentiality agreement."[8] Doc. 112-1 at 4-5.

Plaintiff refused to sign the agreement because of the witness limitation and defendants refused to compromise on its terms. Thus the current motion to compel. The failure to disclose Report Two until one day before Hardy's deposition, along with the supplemental OSHA email production, spurred plaintiff's motion for sanctions.

## II. ANALYSIS

### A. Motion to Compel

Defendants resist Venator's compel motion by first arguing that she failed to *negotiate* in good faith prior to filing.[9] Doc. 112 at 3. That

---

[8] The proposed agreement, among other provisions, limits use of the document to "litigating or attempting to settle the present action," and requires that *only* the parties and witnesses Hardy, McGowan, and Al Cantrell (Interstate's general manager) be allowed to see it. Doc. 59-3 at 41.

[9] Although not the moving party, defendants bear the burden of "showing why the requested discovery should not be permitted," *Henderson v. Holiday CVS, L.L.C.*, 269 F.R.D. 682, 686 (S.D. Fla. 2010), so long as plaintiff first shows that defendants' "answers were incomplete." *Equal Rights Center v. Post Properties, Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007). *See also Morrison v. Philadelphia Housing Authority*, 203 F.R.D. 195, 196 (E.D. Pa. 2001) ("A party moving to compel bears the initial burden of showing the relevance of the requested information. *See Northern v. City of Philadelphia*, 2000 WL 355526, *2 (E.D. Pa. Apr.4, 2000); *Momah v. Albert Einstein*

alone, they say, warrants the Court denying her motion. *Id.* They also contend that Swindell's evaluations are, in any case, not discoverable because they contain private information about a non-party and are irrelevant. *Id.* at 8.

Under Fed. R. Civ. P. 37(a)(1), says plaintiff, parties need not "negotiate" in good faith; they must "confer," which, she contends, the parties have done. Doc. 132 at 3. Because (1) personal, confidential information enjoys no absolute privilege from disclosure, and (2) Swindell's evaluation -- whether poor or favorable -- is relevant to plaintiff's negligent training and supervision claims, defendants must, in plaintiff's view, disclose the evaluation.[10]

### 1. Good Faith

Before moving to compel discovery, a party must "in good faith confer[] or attempt[] to confer with the . . . party failing to make disclosure." Fed. R. Civ. P. 37(a)(1); *see also* S.D. Ga. L.R. 26.5 (reminding counsel of the good faith conference requirement). "That

---

*Med. Ctr.*, 164 F.R.D. 412, 417 (E.D. Pa. 1996). The burden then shifts to the party resisting discovery to justify withholding it.").

[10] Plaintiff has no issue with the evaluation receiving some measure of protection -- just not the "onerous [and] improperly severe" measures that defendants' proposed confidentiality agreement includes.

rule is enforced," *Hernandez v. Hendrix Produce, Inc.*, 2014 WL 953503 at * 1 (S.D. Ga. Mar. 10, 2014), and the conference must be meaningful. *Hernandez v. Hendrix Produce, Inc.*, 297 F.R.D. 538, 540 (S.D. Ga. 2014); *State Farm Mutual Automobile Insurance Co. v. Howard*, 296 F.R.D. 692, 697 (S.D. Ga. 2013).

"Neither face-to-face nor telephone contact is necessarily essential to the "good faith" certification requirement in every case. Sometimes letters, emails, or faxes will suffice." *Scruggs v. International Paper Co.*, 2012 WL 1899405 at * 2 (S.D. Ga. May 24, 2012). Sometimes, however, "more is required than a mere back and forth salvo of papers." *Id.*

That something more happened here. Counsel for both parties spoke by telephone on January 22, 2016, regarding the Swindell evaluation and defendants' desire to produce it pursuant to a protective order. *See* doc. 112-8; doc. 59-3 at 47. They then communicated via email about the same issues. Doc. 112-8. Plaintiff agreed to consent to a protective order, doc. 59-3 at 47, but found defendants' proposed terms far too limiting. *Id.* No final agreement could be reached.

Defendants contend that the phone call and emails were "merely Plaintiff's counsel avowing they would not agree to a confidentiality

agreement under any terms" and should not be considered conferring in good faith. Doc. 112 at 5. Whether that's "conferring" or not, plaintiff's counsel never disavowed all confidentiality agreements. To the contrary, Howard Spiva stated: "We will *agree* not to share the document publicly, but we are not agreeable to any limitations on the use of this document at mediation or trial." Doc. 59-3 at 47 (emphasis added). To characterize that as refusing to agree to a confidentiality agreement "under any terms" borders on outright misrepresentation.

Regardless, counsel for the parties spoke by telephone and exchanged multiple emails about the Swindell evaluation document request. They never could agree on terms of production, but disagreement does not preclude a finding of good faith. Quite the opposite -- the Court finds that plaintiff's counsel *did* confer in good faith prior to moving to compel.

### 2. Discoverability of Swindell's Evaluation

Defendants also contend that the withheld evaluation contains "private and personal information" that should be shielded from disclosure. Doc. 112 at 8. Although she acknowledges that personal information deserves heightened scrutiny as a general proposition,

Venator asserts that no absolute privilege protects it from disclosure when what's sought is relevant and not obtainable elsewhere. Doc. 132 at 8-10. Because that's the case here, she says, the Court should compel production. *Id.* at 14. She "is agreeable to protecting the evaluation . . . from public disclosure," but will not consent to restricting use of the evaluation in this litigation (in particular, she won't consent to limiting its use to three witnesses). *Id.*

As both parties tacitly acknowledge, "[i]t is well settled that there is no absolute privilege for . . . confidential information."[11] 8A WRIGHT AND MILLER, FED. PRAC. & PROC. § 2043 (3d ed. 2010). Instead, "if the information sought is shown to be relevant and necessary, proper safeguards will attend disclosure." *Id.* (footnote added); *see also* Fed. R. Civ. P. 26(c)(1) ("[F]or good cause," courts may "require[] that . . . confidential . . . information . . . be revealed only in a specified way," or otherwise "limit[] the scope of disclosure").

The Swindell evaluation, drafted by Hardy, consists of a date (January 27, 2014 -- exactly two months after Ricky Venator's death),

---

[11] Plaintiff openly argues that sensitive information enjoys no absolute protections. *See, e.g.*, doc. 132 8-9. Defendants implicitly admitted as much by proposing to disclose the document (albeit pursuant to a confidentiality agreement) prior to the present motion's filing. *See* doc. 112-1 at 5.

"to," "from," and "subject" lines, and six names, each with an assigned number (ranging from 1-3, with 1 being "solid above average," and 3 being "below average).[12] It does not elaborate on the numerical ratings. Regardless, any evaluation of Swindell -- who trained and supervised Wingate, the Interstate employee driving the forklift that killed plaintiff's husband -- is relevant.

"Evidence is relevant if it has any tendency to make the existence of any fact or consequence more or less probable than it would be without the evidence." *Steel Erectors, Inc. v. AIM Steel Int'l, Inc.*, 312 F.R.D. 673, 676 (S.D. Ga. 2016). Furthermore, claims and defenses define relevancy's outer bounds for a given case. *See id.* (citing *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997)); *id.* at 676 n. 4 ("It remains true today both that claims and defenses provide discovery's outer bounds and that the court is inclined to err in favor of discovery rather than against it.").

---

[12]   Defendants submitted a copy of the evaluation for *in camera* inspection. Consistent with their assertions to plaintiff and the Court that only one responsive evaluation exists, they delivered only the one document. The Court, for now, accepts those evidentially supported assertions at face value. *See* doc. 112-5 at 3 (Cantrell affidavit declaring that, "to his knowledge," only one evaluation for Swindell exists from November 27, 2012 to the present). But if other evaluations later mysteriously appear -- as happened with the Supervisor's Report addressed by plaintiff's first motion to compel -- the thin Rule 37 ice keeping defendants and defense counsel afloat will shatter (*see* Part II-B, *infra*, addressing plaintiff's motion for sanctions).

Plaintiff asserts, among others, negligent training and supervision claims. *See* doc. 9-1 at 10. An evaluation of Swindell by his supervisor (Hardy), whether done for purposes of bonuses or more generally, certainly "has a[] tendency to make" the existence of training evidence more or less likely. It may, for example, reveal that Swindell received poor marks because he inadequately trained subordinates (particularly since it is dated exactly two months after the incident at issue), or in some way was at least in part responsible for Wingate's alleged negligence. Or, it might reveal the opposite. Either way, the evaluation is *demonstrably* relevant.[13]

Hardy's deposition testimony, despite defendants' contrary contentions (*see* doc. 112 at 10), does nothing to undermine that conclusion. If the evaluation reflects a poor review, it could be used to impeach Hardy (he said he gave Swindell good marks on the post-incident evaluation, *see* doc. 103 at 26), or to show that Hardy felt Swindell bore some responsibility for the Venator accident. If it's

---

[13]    Defendants confusingly argue that the evaluation is irrelevant and thus undiscoverable, *see* doc. 112 at 11 ("Hardy's testimony shows the evaluation is irrelevant") but also that its confidential nature warrants some protection if disclosed to Venator (hence, that it implicitly *is* relevant). *Id.* at 12-13 (arguing in favor of a "confidentiality stipulation and order"). To avoid similar confusion, the Court explicitly finds the evaluation relevant.

consistent with Hardy's testimony, then it could, as plaintiff recognizes, be evidence of a reward given to Swindell for signing the Supervisor's Report Hardy drafted.[14]   Regardless of what the evaluation actually evidences (something that cannot be known absent its use in examining witnesses), it's relevant.

Because the Swindell evaluation is available nowhere else, the Court **GRANTS** plaintiff's motion to compel. Doc. 59. Defendants must produce *both* the Swindell evaluation submitted for *in camera* review, *and* any other document that reflects evaluations of Swindell by his supervisors (whether Hardy or another Interstate employee), regardless of what label the document bears (*i.e.*, it need not be called an "evaluation" to fall within this Order's ambit).   Defendants also must produce any notes of verbal evaluations of Swindell, or any other documentation of Swindell evaluations conducted between November 27,

---

[14] Defendants also suggest that the evaluation lacks relevance because it exists solely to aid Al Cantrell (Interstate's general manager) in determining bonuses. *See* doc. 112 at 9.   Even taking that bonus purpose as true, the factors that informed Swindell's rating remain the same.   What purpose the evaluation ultimately served has no effect on the relevance of that underlying information.

2012 and the present. Failure to comply fully with this Order will result in sanctions.[15]

Nevertheless, plaintiff seeks a relevant non-party employee evaluation that contains sensitive information whose unrestricted disclosure implicates privacy rights. *See Moss v. GEICO Indem. Co.,* 2012 WL 682450 at * 3 (M.D. Fla. Mar. 2, 2012) ("Plaintiff's request for personnel files raises concerns about the privacy rights of the non-party employees whose information it seeks to discover."). In particular, the Swindell evaluation includes information on six Interstate employees who apparently have no connection to this litigation whatsoever. Swindell himself is a non-party too. Though intimately connected to relevant events, he enjoys a greater privacy expectation than plaintiff or defendants. Still, as discussed above, those considerations do not

---

[15] Defendants and their attorneys should not make the mistake of reading this Order (or legitimate discovery requests for demonstrably relevant documents) narrowly to avoid disclosing documents that fall within its scope. That would constitute an intentional violation of a Court order and expose defendants to Rule 37(b)(2)'s most severe sanctions.

Moving forward, in this case and others, counsel should more carefully evaluate a given document's discoverability. Although the defense resistance that generated these first two motions to compel stemmed from genuine disputes, a pattern of miscalculating on the scope of discovery is beginning to emerge. A third compel motion would cement that pattern and justify additional sanctions.

preclude disclosure; rather, they justify safeguards to protect those privacy interests.

One protection is immediately apparent: the evaluation must not be publicly disclosed. Revealing its contents outside the context of this litigation furthers no legitimate end while undermining substantial privacy concerns. The document may be revealed to the parties, their attorneys and agents, and all witnesses with pertinent knowledge of Interstate evaluations, including Swindell, but to no one else. If either party attaches the evaluation to a filing, it must be filed separately under seal, and the Court grants permission to do so under Local Rule 79.7.[16]

That said, plaintiff may use the evaluation for any purpose within this litigation. Limiting its disclosure to Cantrell, Hardy, and McGowan as defendants propose (*see* doc. 112-7 at 3) unfairly restricts how plaintiff may use the evaluation without providing a corresponding benefit to privacy concerns. Eliminating public disclosure protects the six non-party employees with no involvement in this case (and Swindell), while still allowing plaintiff access to relevant information about Swindell.

---

[16] The public has no interest in Swindell's evaluation that exceeds his privacy expectations. And, at least in this case, the public also has no interest in defendants' bonus policies, only in why Swindell received the evaluation given.

While the Court acknowledges that Swindell may now be exposed to how defendants evaluated his performance, plaintiff's right to discovery outweighs defendants' desire to keep from its employees how it grades them for bonuses. *See Steel Erectors*, 312 F.R.D. at 676 n. 4 ("[T]he court is inclined to err in favor of discovery rather than against it.").

With those instructions in mind, the parties must confer regarding the precise language of a protective order and submit a proposal within 10 days of the date this Order is served. Once the Court enters that proposed protective order (it must comply with the above restrictions), defendants will have three days to produce the Swindell evaluation to plaintiff. Any documents, notes, or memoranda (to the extent they exist) that reflect supervisory evaluations (whether verbal or written) of Swindell other than the one page document produced to the Court must be produced to plaintiff within ten days of the date the Court enters the proposed protective order.

### 3.    Rule 37 Sanctions

Both parties ask the Court to award expenses associated with plaintiff's motion to compel (including attorney's fees) should they prevail. Doc. 61-1 at 25 (plaintiff's sanctions request); doc. 112 at 14

(defendants'). Defendants did not prevail (the Court granted plaintiff's motion to compel), so only plaintiff's request warrants scrutiny.

When the Court grants a motion to compel, Fed. R. Civ. P. 37(a)(5)(A) *mandates* that the "party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both . . . pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Only if (1) "the movant filed the motion before attempting in good faith to obtain the . . . discovery without court action;" (2) the failure to respond was justified; or (3) "other circumstances make an award of expenses unjust, may a court decline to award expenses to a prevailing party. *Id.*; *Boyd v. Experian Information Solutions, Inc.*, 2016 WL 1239267 at * 4 (S.D. Ga. Mar. 29, 2016) ("A reading of the Rule leads to the inescapable conclusion that the award of expenses is mandatory against a party whose conduct necessitated a motion to compel discovery, and/or against the attorney who advised such conduct, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." *Merritt v. International Board of Boilermakers*, 649 F.2d 1013, 1019 (5th Cir. 1981) (party opposing motion to compel liable

for moving party's reasonable expenses and attorney's fees regardless of whether party opposing motion acted in bad faith).").

Exceptions one and two do not apply here.[17] "Other circumstances," however, do exist. Defendants' resistance to plaintiffs' motion rests on protecting the legitimate privacy interests of its employees and its formula for awarding bonuses. *See* doc. 112. They do not refuse production based on specious concerns. On the contrary, they advance arguments that Fed. R. Civ. P. 26(c)(1)(G) explicitly recognizes as justification for a protective order. And, they proposed such an order prior to this dispute finding its way before the Court.

Although the parties could not agree on the terms of production without Court assistance, awarding plaintiff her expenses would not incentivize discovery cooperation moving forward. Instead, it would telegraph that substantial justification[18] for resisting production provides no safe harbor and is treated the same as wanton obstructionism. That

---

[17] As discussed above, the Court finds that the parties conferred in good faith prior to plaintiff filing her motion to compel. Since defendants responded, only the "other circumstances" exception possibly applies.

[18] "Substantial justification" exists "where the party's nondisclosure resulted from some reasonable and genuine dispute concerning the discovery request." *King v. Dillon Transportation, Inc.*, 2012 WL 592191 at * 2 (S.D. Ga. Feb. 22, 2012).

message cannot be sent, so the Court declines to award plaintiff her expenses or fees.

## B.    Motion for Sanctions

In addition to sanctions for refusing to produce Swindell's evaluation, plaintiff also asks for a bevy of punishments for alleged discovery violations related to defendants' belated production of Report Two and additional OSHA-related emails. Doc. 61. Defendants' "pattern of misconduct," says plaintiff, "worked a fraud upon this Court" and merits an award of expenses and fees under Fed. R. Civ. P. 26(g), and the ultimate sanction -- striking defendants' answers and imposing a default judgment -- under Rule 37(b)(2). Doc. 61-1 at 4.

### 1.    Rule 26(g)

As is the case with motions, discovery disclosures and responses must be signed by a represented party's attorney. Fed. R. Civ. P. 26(g)(1); Fed. R. Civ. P. 11 (motions and pleadings must be signed by counsel). That signature "certifies that to the best of the [attorney's] knowledge, information, and belief *formed after a reasonable inquiry*," that, "with respect to a disclosure, it is complete and correct as of the time it is made; and with respect to a discovery . . . response . . . it is:" (1)

consistent with the federal rules and existing law; (2) "not interposed for any improper purpose;" and (3) not unreasonably or unduly burdensome or expensive. Fed. R. Civ. P. 26(g)(1) (emphasis added). Should "a certification violate[] th[at] rule without substantial justification,[19] the court . . . must impose an appropriate sanction[20] on the signer, the party on whose behalf the signer was acting, or both." *Id* at (g)(3) (footnotes added).

"The comments to subsection (g)(1) clarify that Rule 26(g) broadly 'imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37.'" *In re Delta/AirTran Baggage Fee Antitrust*

---

[19] "[S]ubstantial justification"

> does not mean "justified to a high degree, but . . . justified to a degree that could satisfy a reasonable person." *Sun River Energy, Inc.* [*v. Nelson*], 800 F.3d [1219,] 1227 [(10th Cir. 1015)] (quoting *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101 L.Ed.2d 490 (1988)). *Cf. Grider v. Keystone Health Plan Central*, 580 F.3d 119 (3rd Cir. 2009) (suggesting that the "substantial justification" is "satisfied if there exists a genuine dispute concerning compliance") (citing *Tolerico v. Home Depot*, 205 F.R.D. 169, 175–76 (M.D. Pa. 2002)); *Sender* [*v. Mann*], 225 F.R.D. [645,] 656 [(D. Col. 2004)] ("[A] party's failure to disclose is substantially justified where the non-moving party has a reasonable basis in law and fact, and where there exists a genuine dispute concerning compliance").

*A PDX Pro Co. v. Dish Network Service, LLC*, 311 F.R.D. 642, 656 (D. Col. 2015).

[20] Such sanctions may include "reasonable expenses, including attorney's fees, caused by" the certification violation. Fed. R. Civ. P. 26(g)(3).

*Litigation*, 846 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012) (quoting Fed. R. Civ. P. 26(g) advisory committee's note); *Dish Network*, 311 F.R.D. at 653 ("[T]he practical import of Rule 26(g) is to require vigilance by counsel throughout the course of the proceeding."). With respect to the "reasonable inquiry" attorneys must make, counsel may "rely on assertions by the client . . . as long as that reliance is appropriate under the circumstances." Fed. R. Civ. P. 26(g) advisory committee's note; *St. Paul Reinsurance Co. v. Commercial Financial Corp.*, 198 F.R.D. 508, 516 (N.D. Iowa 2000). "Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances," but in any case must include an "effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." Fed. R. Civ. P. 26(g) advisory committee's note.

Defense counsel's certifications here encompass two distinct inquiries, both of which must be reasonable. First, the inquiry associated with the search of Interstate's computer system for OSHA-related emails, and second, the inquiry into "[a]ll incident reports . . . made as a result of the" accident that killed Ricky Venator. Doc. 61-1 at 4, 14 (citing plaintiff's request for production of documents).

For e-discovery related inquiries like the OSHA email search, *Delta/Airtran* is instructive.[21] There, Delta "belatedly produced relevant documents," discovered on backup hard drives it never knew existed until after discovery's close. *Delta/AirTran*, 846 F. Supp. 2d at 1350. Delta contended that its counsel "made reasonable inquiries" under Rule 26(g) because "each response was given only after Delta counsel had engaged in several conversations with Delta's [IT] department and/or IBM[, Delta's IT vendor,] to verify the relevant back-up tapes Delta had in its possession." *Id.* But counsel never confirmed with Delta's IT people or IBM that all hard drives had actually been searched. *Id.* Counsel provided IT a list of custodians, but failed to ensure that each person's hard drive was then searched. *Id.*

The court found "immaterial" that Delta immediately produced the documents upon locating the hard drives. *Delta/AirTran*, 846 F. Supp. 2d at 1350. Delta had represented to the plaintiffs and the court that its discovery responses were complete and that its productions included documents for all backup drives. *Id.* When that turned out not to be the

---

[21] Defendants dismiss *In re Delta/Airtran* because Delta failed to timely produce 60,000 pages of documents, *see* 846 F. Supp. 2d at 1341, while the OSHA emails and Report Two amount to a mere 22 pages. *See* doc. 117 at 17. What matters in determining an inquiry's reasonableness, however, is defense counsel's conduct in each case, not the size of a production.

case, and when Delta failed to show that it ever confirmed with its IT department that *all* drives were searched, the court found "that Delta did not conduct a reasonable inquiry," and provided no substantial justification for not doing so. *Id.* at 1350-51.

Here, "[d]efendants and defense counsel admit they initially failed to identify [Report Two] and produce 19 pages of [s]upplemental" OSHA emails. Doc. 117 at 2. They don't try to justify that failure, or describe the inquiry counsel conducted. Instead, they argue that "supplementation of these documents did not prejudice Plaintiff in any way," and that they "supplemented . . . within the discovery period and very soon after the[] documents were discovered." *Id.*

But as *Delta/Airtran* makes clear, doing the right thing upon discovery of documents does not erase a Rule 26(g) violation for failing to conduct a reasonable search in the first place. *See* 846 F. Supp. 2d at 1350 ("[T]he fact that Delta is now producing these documents is immaterial."); *see also Kipperman v. Onex Corp.*, 260 F.R.D. 682, 698 (N.D. Ga. 2009) (Rule 26(g) sanctions are mandatory regardless of prejudice and thus "[o]nce the court makes the factual determination that a discovery filing was signed in violation of the rule, it must impose

'an appropriate sanction'"). Defendants' original document production was, as they admit and as their supplemental email production illustrates, not "complete and correct." Fed. R. Civ. P 26(g). Yet, defense counsel signed their responses and disclosures and in doing so certified that those disclosures were complete. *See, e.g.*, doc. 61-2 at 42. Unless defense counsel's completeness belief was "formed after a *reasonable* inquiry," *id.* (emphasis added), then, a Rule 26(g) violation occurred.

That inquiry began and ended with McGowan. As Interstate's OSHA point person (*see* doc. 96 at 16 ("I'm still ultimately the point of contact for OSHA and OSHA questions."); doc. 117-6 at 3, he provided defense counsel with documents responsive to plaintiff's request for "any correspondence . . . sent to OSHA by Interstate . . . relating to the" Venator incident. Doc. 61-2 at 33. Counsel provided him with plaintiff's requests and he searched Interstate's records for responsive documents. *See* doc. 117-6 at 3. Specifically, he searched his "inbox, outbox, sent items, and deleted items" for "correspondence with OSHA by using the

terms 'OSHA' and 'Szczepanik,'[22] but searched no other areas on his computer or Interstate's computer system. *Id.* Defense counsel never asked him to search additional locations or to involve Interstate's IT department in the search, nor did counsel themselves confer with IT before or after McGowan's search.

That produced the five pages of emails whose production the Court previously compelled. *See* doc. 53 at 13. In the beginning of December 2015, before his re-deposition, McGowan located additional relevant emails while cleaning out his computer in preparation to retire. Doc. 117-6 at 3. He immediately turned them over to defense counsel who then sent them to plaintiff at least ten days before McGowan's deposition. *See* doc. 117-3 at 2. After the deposition, McGowan contacted an Interstate network and system engineer, Christopher McLaughlin, who provides "IT support to Interstate," for help in determining why he found additional OSHA emails. Doc. 117-5 at 1. McLaughlin "completed an all mail items search . . . using the search terms 'OSHA' and 'Szczepanik,'" which went "through every folder in [McGowan's] email, including subfolders." *Id.* at 3. McGowan's original

---

[22] Dave Szczepanik "was the OSHA investigator who investigated the accident involving Mr. Venator." Doc. 117-6 at 3.

search omitted subfolders and thus omitted the emails defendants later produced. It was tantamount to opening a storage closet and checking only eye-level shelves while ignoring those above and below.

McGowan's search thus fell far short of what should have occurred to ensure that all responsive emails made their way to plaintiff. A human resources manager by trade (doc. 96 at 17 (HR manager at Interstate since 1993)), McGowan had no business being the sole person responsible for conducting electronic searches of Interstate's computer systems for OSHA-responsive documents. Even he admits that "I'm not a guru, a tech guru." Doc. 97 at 38.

Certainly defense counsel could "rely on assertions by [McGowan]," but only if "that reliance [was] appropriate under the circumstances." Fed. R. Civ. P. 26(g) advisory committee's note. It wasn't. McGowan has no background in computers or searching email systems. What's more, defense counsel never made an "effort to assure that [McGowan] ha[d] provided all the information and documents available." *Id.* They instead took a human resources manager's word that his own search of a device he admittedly didn't fully understand uncovered all there was to know. As McLaughlin's post-email discovery shows, counsel could have involved

Interstate's own IT department from the beginning to ensure searches pulled all responsive documents. Litigation resources, including this Court's time, are now being consumed.

Attorneys need not micromanage every detail of investigating a client's records (clients are in a much better position to efficiently survey their own documents), but they must ensure that what the client does constitutes a reasonable search. Defense counsel here didn't do that. They sent McGowan plaintiff's discovery requests, made no effort to determine what McGowan did to investigate, and then uncritically accepted what McGowan gave them in return. Particularly when the client, like Interstate did, has an IT department, electronic discovery best practices include using those technology professionals to ensure that document searches cull from all available sources, not just those non-experts know about. *See Delta/AirTran*, 846 F. Supp. 2d at 1350 (defense counsel failed to confirm that their client's IT department searched all backup drives and thus violated Rule 26(g)). Like Delta's counsel, defense counsel here neglected to ensure that McGowan properly searched his computer for all OSHA emails related to the Venator incident. Because defendants and counsel offer no justification, much

less a substantial one, *see Whitesell Corp. v. Electrolux Home Products, Inc.*, 2015 WL 5316591 at * 5 (S.D. Ga. Sept. 10, 2015), that neglect violated Rule 26(g).

Plaintiff also urges the Court to impose Rule 26(g) sanctions for defendants' failure to produce Report Two until one day before Hardy's deposition. *See* doc. 61-1 at 19. As with the OSHA emails, the propriety of sanctions turns on whether defense counsel conducted a reasonable inquiry prior to certifying that defendants produced all Interstate incident reports.[23]

Also like the email production, McGowan spearheaded the Interstate investigation into plaintiff's discovery requests for supervisor's reports. *See* doc. 97 at 8. He worked with Ronnie Moore, Interstate's safety coordinator and custodian of accident investigation report files (*see* doc. 101 at 9, 12), to obtain copies of the Supervisors Report that formed the basis of plaintiff's first motion to compel. Before her first deposition in July 2015, Moore produced to McGowan Report

---

[23] Like their OSHA email production, defendants' original incident report production was incomplete (*i.e.*, they only produced Report One, not Report Two). Counsel nevertheless certified its completeness.

One, but not Report Two because, she says, it was a "draft" of Report One. Doc. 101 at 11.

McGowan testified that he first saw Report Two the same day defense counsel produced it to plaintiff. Doc. 97 at 7. He "found out that Ronnie Moore had it," after it "came up in a conversation," so he "got her to make a copy" to send to defense counsel. *Id.* at 8. That conversation occurred "during a meeting with" defense counsel which Moore and Hardy attended "for a period of time." *Id.* at 9.

To hear Hardy tell Report Two's tale, however, is to learn that it surfaced a week before that conversation and his re-deposition. *See* doc. 103 at 51-52. He "went to [Moore] to look at [Report One]," and "she mentioned that she had the original document[, Report Two]." *Id.* at 52. He reviewed that, but informed no one that it "was still in [Moore's] file." *Id.* at 53. Moore, in her second deposition, said nothing about the timing of Report Two's rediscovery,[24] while defense counsel learned it existed only when McGowan forwarded the document.

All of that is apparent now, but only because of Court-ordered depositions (and the witness preparation they engendered) stemming

---

[24] She also said nothing about its existence during her first deposition in July 2015.

from plaintiff's first motion to compel. Critically, that information is *not* apparent because defense counsel directed McGowan to ask other Interstate employees for *all* incident reports, or followed up with McGowan on his investigations into discovery requests after he sent over documents. Instead, counsel sent plaintiff's requests to McGowan, he contacted Moore, Moore provided files she determined were responsive without guidance from counsel (which did *not* include "drafts," despite plaintiff requesting *all* incident reports), and McGowan forwarded those to counsel, who then apparently made no "effort to assure that [he] ha[d] provided all the information and documents available." Fed. R. Civ. P. 26(g) advisory committee's note. Counsel never, for example, asked McGowan where he looked for documents, or otherwise inquired about the scope and direction of his investigations. The record indicates that counsel simply gave McGowan plaintiff's discovery requests, sent him to collect responsive documents, and received those documents in return.

That wasn't a "reasonable inquiry" for emails or incident reports. Attorneys must do more than turn over requests to a client's employee and expect that person, particularly if he or she is a non-lawyer, to conduct an investigation that satisfies Rule 26(g). That person typically

will need some additional guidance. Regardless, attorneys have a post-investigation obligation to make sure all responsive information is provided. *See* Fed. R. Civ. P. 26(g) advisory committee's note; *St. Paul Reinsurance Co.*, 198 F.R.D. at 516 ("[U]nder Rule 26(g)(2) . . . [the subject of the inquiry] is the thoroughness, accuracy and honesty (as far as counsel can reasonably tell) of the responses *and the process through which they have been assembled.*") (emphasis added). Again, counsel can rely on a client's assertions, but in this case blind, uncritical reliance was not justified. The Court therefore finds that defense counsel failed to conduct a reasonable inquiry into Interstate's incident report production and so violated Rule 26(g).

As noted above, the rule "mandates that sanctions be imposed on attorneys who fail to meet [its] standards." Fed. R. Civ. P. 26(g) advisory committee's note; *King*, 2012 WL 592191 at * 3. Although prejudice plays no role in assessing whether a Rule 26(g) violation exists, it is relevant in determining the "appropriate sanction," Fed. R. Civ. P. 26(g)(3), as are the frequency and seriousness of violations. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th Cir. 1997)

("The nature of the sanction is a matter of judicial discretion to be exercised in light of the particular circumstances.").

Here, defense counsel committed two Rule 26(g) violations prejudicial to the plaintiff. First, counsel failed to oversee Interstate's electronic records searches and ensure that McGowan in particular provided *all* OSHA emails in his possession. They never involved Interstate's IT team or in any way made sure that McGowan searched all possible locations for the emails. That is "a far cry from the serious discovery abuse and outright mendacity engaged in by the defense counsel sanctioned in *Malautea* [*v. Suzuki Motor Corp.*, 148 F.R.D. 362 (S.D. Ga. 1991)]," *King*, 2012 WL 592191 at * 3, but it does evince a somewhat surprising misunderstanding of what counsel's discovery role should be.

Still, defendants immediately produced the emails after McGowan found them, and did so almost two weeks before his re-deposition.[25] That

---

[25] Plaintiff notes that McGowan discovered the supplemental OSHA emails only after plaintiff inquired about apparent gaps in the first set of OSHA emails. Doc. 133 at 10. She then infers nefarious defense motives from the delay between her inquiry and the supplemental production, defense counsel's alleged failure to ever respond to the inquiry, and McGowan's superior knowledge of the original production's gaps. *Id.* That's a possible, but not inevitable, inference to make. It is undisputed that McGowan immediately turned over the supplemental emails to defense counsel after he found them and counsel in turn immediately turned them over the plaintiff. That

lessens the prejudicial impact of untimely production (plaintiff had ample time to prepare questions based on the newly produced material), but does not eliminate it completely. Plaintiff had the opportunity to question McGowan, Moore, and Hardy about the emails, but not Swindell, who was copied on many of the supplemental OSHA emails. *See* doc. 61-3 at 7-9. Because the emails' disclosure came *after* the Court compelled second depositions of three Interstate employees, plaintiff never had a reason or the chance to seek a second chance to question Swindell. Even if his hypothetical testimony revealed nothing of great value, the foregone opportunity itself prejudiced plaintiff.

Report Two's tardy production also prejudiced plaintiff because she was unable to depose Swindell. He authored Report Two in its entirety and signed both it and Report One. He and Hardy (Report One's penman) are the only two people who know the significance of the differences between Reports One and Two. *See* doc. 117-1; doc 117-3. Deposing Swindell to suss out why, for example, he referred to Wingate's use of the clamp truck as "improper" in Report Two and why he later

---

suggests a more benign explanation. Faced with those opposing interpretations of events, the Court declines to infer more than negligence by McGowan and rules violations by defense counsel.

signed Report One (which omitted that word), could have provided plaintiff with valuable evidence against defendants.[26]  Not being able to examine Swindell on a crucial document that he authored unquestionably prejudiced plaintiff.

Twice the Court has waded hip deep into this case's discovery waters.  Twice those forays have resulted in orders compelling defendants to produce documents.  And twice -- with the OSHA emails and Report Two -- have defendants and their attorneys blown their Rule 26(g) disclosure obligations to plaintiff's prejudice.

Although the Court does not find any intent by defendants to mislead and obfuscate (and so refuses to impose *Malautea*-level sanctions, *see* Rule 37 analysis *infra*), defendants and defense counsel have consistently failed to turn over important discoverable documents (albeit with enough justification to avoid motion to compel-based sanctions) and engage in the reasonable inquiries required by Rule 26(g).  Deterring that behavior moving forward merits something more than a written reprimand.

---

[26]  It also, of course, could have produced a credible, benign explanation for the report discrepancies.  But again, it's the *opportunity* to depose Swindell that prejudiced plaintiff, not the lack of hypothetical testimony in her favor.

Hence, defense counsel must pay plaintiff's reasonable expenses and fees associated with this motion for sanctions. Such a sanction reinforces to counsel the preeminent importance of "engag[ing] in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37'" without imposing greater costs than necessary to make that message hit home. *Delta/AirTran*, 846 F. Supp. 2d at 1350. Since its employees contributed to the violations by conducting a woefully insufficient electronic records search (McGowan), and unilaterally deciding that Report Two need not be produced (Moore), Interstate must pay $1,000 ($500 to plaintiff and $500 to the Clerk of Court) within fourteen days of the date this Order is served.

### 2. Rule 37(b)

Beyond improperly certifying discovery responses and productions, plaintiff also argues that defendants intentionally suppressed Report Two and in doing so violated this Court's compel order, defrauded the Court, and cemented a pattern of willfully withholding discoverable documents. Doc. 61-1 at 24. Plaintiff thus urges the Court to strike their answers and impose default judgments as sanctions. *Id.* In the alternative, she asks that the Court order a premises inspection of

Interstate's computer system to insure that no further relevant OSHA emails remain undisclosed. *Id.* at 24-25.

Defendants counter that, despite initially failing to identify the emails and Report Two, they immediately produced both after their discovery. Doc. 117 at 3. That, they say, constitutes "supplementing discovery pursuant to Fed. R. Civ. P. 26(e)," not willful disobedience of a Court order or document concealment. *Id.* Hence, no sanctions are warranted.

"In general, Rule 37 provides authority for a court to sanction a party for abuses in the discovery process." *Malautea v. Suzuki Motor Corp.*, 148 F.R.D. 362, 370 (S.D. Ga. 1991), *aff'd sub nom*, 987 F.2d 1536 (11th Cir. 1993). "If a party or [its attorney] . . . fails to obey a[ discovery] order . . . the court . . . may" strike pleadings, render default judgments, stay proceedings, and direct that facts be taken as established, among other sanctions. Fed. R. Civ. P. 37(b)(2)(A). "Instead of or in addition to" those severe sanctions, courts may order that a party or its attorney pay "the reasonable expenses, including attorney's fees, caused by the failure" to obey the court's discovery order. *Id.* at (b)(2)(C). Although a "district court has discretion to decide what

sanctions are just," the harshest sanctions "'ought to be the last resort --
ordered only if non-compliance is due to willful or bad faith disregard of
court orders.' *Adolph Coors Co. v. Movement Against Racism*, 777 F.2d
1538, 1542 (11th Cir. 1985)." *Malautea*, 148 F.R.D. at 371.

The Court already, under Rule 26(g), has imposed on defendants
plaintiff's expenses and fees associated with her motion for sanctions. To
strike pleadings or impose a default judgment based on the present
record would exceed what is necessary to deter defendants, "and
similarly situated parties, from repeating this . . . conduct." *Malautea*,
148 F.R.D. at 373. This case, contrary to plaintiff's insistence, is not
*Malautea*. There, Suzuki and its attorneys consistently, over many
orders and discovery requests, interpreted this Court's instructions as
narrowly as possible to avoid disclosure. *Id.* They interposed meritless
objections countless times. *Id.* at 374. And they "answered only as much
of [many interrogatories] as they deemed absolutely necessary to appear
compliant." *Id.* When ordered to reveal a specific set of damaging
documents, defense counsel instructed Suzuki not to based on a crabbed
reading of the order. *Id.*

Whatever Hardy, Moore, and Swindell's motivations surrounding Report Two's creation and delayed production, whatever McGowan's intent regarding the OSHA emails, and whatever defense counsel's intent in conducting substandard discovery investigations, none of it -- singularly or cumulatively -- matches Suzuki's rank obstructionism and fraudulent linguistic gymnastics. Again, defense counsel there actively instructed Suzuki executives to narrowly construe this Court's orders to avoid disclosing damning evidence. *Malautea*, 148 F.R.D. at 373. At worst, counsel in this case simply failed to adequately inquire into their client's own records investigation. Once Report Two and the supplemental OSHA emails came to counsel's attention, they immediately produced them to plaintiff. Nothing suggests they knew the documents existed and purposely fell short of an appropriate inquiry in order to avoid their discovery, nor that they perpetuated an obstructionistic atmosphere. *Malautea*-level sanctions, then, are not justified.

The Court also declines to order a site inspection of Interstate's computer systems. Venator believes that delayed production of the supplemental OSHA emails, and McGowan's inadequate search in

response to her original discovery requests suggests (1) a nefarious, concealment-based motive, and (2) that more emails might lurk around the bend. *See* doc. 61-1 at 17. More likely -- and the only negative inference supported by the record -- is that McGowan simply lacked the computer or legal knowledge necessary to appropriately investigate. And McLaughlin's belated technical search of McGowan's computer means that any future search by IT professionals likely would duplicate his effort. Although inexcusably late, McGowan and defense counsel's immediate production of the supplemental emails upon their discovery points to negligent investigation and subsequent supplementation, not an intent to deceive. Hence, the sanctions already imposed will suffice.

## III. CONCLUSION

The Court **GRANTS** plaintiff's second motion to compel. Doc. 59. The parties must confer regarding a proposed protective order, taking into account the Court's instructions outlined above, and file that proposal within ten days of the date this Order is served. Once the Court enters that order, defendants must produce to plaintiff the Swindell evaluation submitted for *in camera* review within three days. Within ten days of the protective order's entry, defendants must produce any other

documents, notes, or memoranda (to the extent they exist) that reflect supervisory evaluations (whether verbal or written) of Swindell conducted between November 27, 2012 and the present.

The Court **GRANTS IN PART** and **DENIES IN PART** plaintiff's motion for sanctions. Doc. 61. It will not strike defendants' answer or enter default judgment. Nor will it require defendants to submit to a site inspection so plaintiff can search for additional emails. It will, however, require that defense counsel pay plaintiff's attorney's fees and costs associated with litigating her sanctions motion.[27] And Interstate must remit $500 to the Clerk of this Court and $500 to plaintiff within fourteen days of the date this Order is served.

**SO ORDERED**, this  15th  day of April, 2016.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[27] Within 21 days of the date this Order is served the parties in good faith must confer and genuinely attempt to resolve the appropriate amount of fees and costs. Only after that conference may they invoke judicial assistance in determining a fee award.